UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

– against –

ALTON BARNES,

                              Defendant.

**OPINION & ORDER**

22 Cr. 109 (ER)

Ramos, D.J.:

Defendant Alton Barnes is charged in a one count indictment with being a felon in

possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(1), and (2).  Doc. 5.

Barnes moved to suppress the evidence seized by law enforcement during his arrest on July 14,

2021, including a firearm and his post-arrest statements.  Doc. 27.  Barnes argues that the police

violated his Fourth Amendment rights when they searched him prior to the arrest.  Doc. 28.  The

Government argues that the officers had reasonable suspicion to stop Barnes and perform a legal

*Terry* stop, and therefore the evidence and statements should not be suppressed.  Doc. 32.

Barnes also requests an evidentiary hearing on his motion, which the Government argues is

unnecessary because there are no material facts in dispute.  Doc. 35.  At a status conference held

on October 5, 2022, the Court advised that the motion was denied and that an opinion would

issue.  For the reasons set forth below, Barnes' motion to suppress and his motion for an

evidentiary hearing are DENIED.

## I.   FACTUAL BACKGROUND

At approximately 8:00 p.m. on July 14, 2021, an off-duty officer with the New York City

Police Department (NYPD), Sergeant Derek Brennan, observed two individuals on the corner of

149th Street and Morris Avenue in the Bronx, NY.  Def. Ex. B at 1 (Interview of Sergeant

Brennan conducted by the U.S. Attorney's Office for the Southern District of New York). Sergeant Brennan saw that one of the individuals ("the shooter") raised his arm, and then he heard two gunshots, though he did not see a gun.  *Id.*  Sergeant Brennan followed the individuals in his car, called 911 to report that shots had been fired, and gave a description of the two individuals.  Doc. 44-1 at 3.  Sergeant Brennan described the shooter as a "Black Hispanic" male in his "early twenties" and between approximately 5'5" to 5'8" in height.  *Id.* at 4–5, 7.  Sergeant Brennan also stated that the shooter wore "red shorts," a "white t-shirt," and a "black bag."  *Id.* at 3.  Sergeant Brennan described the other individual as a Black male wearing a "white t-shirt and gray pants."  *Id.* at 6.

As Sergeant Brennan spoke to the 911 operator, he encountered three NYPD officers, including Officers Eller and Callinan, who had responded to a central dispatch radio run about the shooting.  Def. Ex. D at 1 (Interview of Officer Eller conducted by the U.S. Attorney's Office for the Southern District of New York).  Sergeant Brennan repeated his description of what the two individuals were wearing to the officers.  *Id.*  Officer Eller noted that this description matched the description from the radio run.[1]  *Id.*  The officers then drove south on Morris Avenue, turned east onto East 148th Street, and looked south onto College Avenue, where they saw Barnes.  Def. Ex. D at 1.  Barnes, a black man, was wearing red shorts, a red hat, a black backpack, and a white t-shirt with red, yellow, and black cartoon graphics.  Def. Ex. E at 0:44 (Officer Eller's body-worn camera video).  Officers Eller and Callinan approached Barnes as he walked down College Avenue towards East 145th Street.  *Id.*

Officer Callinan asked Barnes if he had heard gunshots and if he had any identification with him.  Def. Ex. F at 1:00 (Audio recording of Officer Callinan's body-worn camera video).

---

[1] The transcript of the radio run also contained a description of the shooter as "a male with a white t-shirt and red shorts."  Doc. 44-2 at 3.

Barnes replied that he had not heard gunshots but he did have identification.  *Id.* at 1:02.   At this time, there were several officers standing around Barnes.  *Id.*  Officer Callinan then began to frisk Barnes as Officer Eller stood behind him and held onto his arm.  *Id.*  Officer Callinan frisked Barnes' pocket and along the bottom of his backpack.  *Id.* at 1:05.  Officer Callinan then asked Barnes what was in his bag, and Barnes answered that it contained his wallet and identification.  Def. Ex. I at 1:03 (Audio recording of Officer Hijazi's body-worn camera video).  One officer explained to Barnes, "you literally match the description."  Def. Ex. H at 1:17 (Audio recording of Officer Luciano's body-worn camera video).  Officer Eller then frisked the backpack, focusing on the bottom right corner, unzipped and looked inside the front pocket of the backpack, and then unzipped and looked inside the main pocket.  Def. Ex. I at 1:11.  Immediately upon looking inside the main pocket, Officer Eller reacted by pulling Barnes' arms behind his back to arrest him.  *Id.* at 1:28.  The officers then took the backpack from Barnes and recovered the firearm that was inside.  *Id.* at 2:28.

A few minutes later, Sergeant Brennan was brought to the location where the officers were holding Barnes, and Sergeant Brennan quickly confirmed that Barnes was not the shooter.  Def. Ex. J at 5:20 (Officer Robinson's body-worn camera video), Def. Ex. B at 2.  Officer Eller said to another officer at the location that "you could feel it through the bag," in reference to the firearm in the backpack.[2]  Def. Ex. E at 6:40.  The officers transported Barnes to the 40th precinct.  *Id.*  At the precinct, Barnes orally waived his *Miranda* rights and stated during an interrogation, in sum and substance, that he knowingly possessed the firearm.  Doc. 1 at 3; Def. Ex. A at 2 (Alton Barnes declaration in support of the motion to suppress).

## II.    LEGAL STANDARD

---

[2] Later, in an interview with the United States Attorney's Office, Officer Eller reiterated that he had felt a hard shape in the backpack during the frisk, and then saw the gun at the bottom of the backpack.  Def. Ex. D at 1.

### A.  Evidentiary Motions

"On a motion to suppress evidence in a criminal trial, once [the defendant] has established a basis for his motion, the burden rests on the Government to prove, by a preponderance of the evidence, the legality of the actions of its officers."  *United States v. Echevarria*, 692 F. Supp. 2d 322, 332 (S.D.N.Y. 2010) (alteration in original) (quoting *United States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)); *see also United States v. Pena*, 961 F.2d 333, 338–39 (2d Cir. 1992)).  If a court concludes that a search or seizure, including a *Terry* stop, violated the Fourth Amendment, "it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure."  *See United States v. Matos*, No. 17 Cr. 182 (KBF), 2017 WL 5989203, at *3 (S.D.N.Y. Dec. 4, 2017) (citing *Mapp v. Ohio*, 367 U.S. 643 (1961)).  Accordingly, if the Government fails to show that a stop was legal, then "its fruits, including the [defendant's] statements and the physical evidence seized . . . must be suppressed."  *United States v. Fiseku*, No. 15 Cr. 384 (PAE), 2015 WL 7871038, at *6 (S.D.N.Y. Dec. 3, 2015), *aff'd*, 906 F.3d 65 (2d Cir. 2018), and *aff'd*, 915 F.3d 863 (2d Cir. 2018).

### B.  Fourth Amendment Searches and Seizures

The Fourth Amendment to the United States Constitution protects the right of people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures.  *Davis v. United States*, 564 U.S. 229, 236 (2011).  In its Fourth Amendment cases, the Second Circuit has recognized that there are "three levels of interaction between agents of the government and private citizens," each level requiring a different degree of justification.  *United States v. Tehrani*, 49 F.3d 54, 58 (2d Cir. 1995).  First, the police may initiate a voluntary encounter with an individual and ask questions as long as the person is willing to listen.  *See Brown v. City of Oneonta*, 221 F.3d 329, 340 (2d Cir. 2000).  Such an encounter does not

constitute a seizure and therefore does not require any justification nor does it "trigger Fourth Amendment scrutiny unless it loses its consensual nature." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Second, the police "can stop and briefly detain a person for investigative purposes" if they have "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Third, the police may arrest an individual if they have probable cause to believe that he has committed a crime. *See Terry*, 392 U.S. at 10. Only the second level of interaction, a *Terry* stop, is implicated here.

A *Terry* stop is a brief investigatory stop of another person falling short of an arrest, but still constituting a seizure. *United States v. McDow*, 206 F. Supp. 3d 829, 850 (S.D.N.Y. 2016). "Under *Terry v. Ohio* . . . police may briefly detain an individual for questioning if they have a reasonable suspicion that criminal activity is afoot, and may frisk him if they reasonably believe he is armed and dangerous." *United States v. Elmore*, 482 F.3d 172, 178 (2d Cir. 2007). A *Terry* stop for weapons must be "confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry*, 392 U.S. at 29. To sustain a stop, police "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

Reasonable suspicion requires more than an "inchoate and unparticularized suspicion or hunch." *Alabama v. White*, 496 U.S. 325, 329–30 (1990) (internal quotation marks omitted). "The reasonable suspicion standard is not high." *United States v. Weaver*, 9 F.4th 129, 140 (2d Cir. 2021) (en banc) (internal citation and quotation marks omitted). "Like probable cause, reasonable suspicion is determined based on the totality of the circumstances" known to the

officers at the time of the stop.  *Elmore*, 482 F.3d at 179.  Courts must "view the totality of the circumstances 'through the eyes of a reasonable and cautious police officer on the scene.'" *United States v. Bailey*, 743 F.3d 322, 332 (2d Cir. 2014).  In doing so, Courts "see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  This includes considering law enforcement officers' "own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'"  *Id.*  (quoting *Cortez*, 449 U.S. at 418).

"Probable cause to arrest exists when the arresting officer has knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (internal quotation marks omitted).  "[T]he probable cause inquiry is based upon whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest."  *Jaegly v. Couch*, 439 F.3d 149, 153 (2d Cir. 2006) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)).  The test is "objective rather than subjective." *Id.* at 154.  Additionally, "[w]hen making a probable cause determination, police officers are entitled to rely on the allegations of fellow police officers." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006) (internal quotation marks and citations omitted).  "Absent significant indications to the contrary, an officer is entitled to rely on his fellow officer's determination that an arrest was lawful."  *Id.* (internal quotation marks omitted); *accord United States v. Colon*, 250 F.3d 130, 135 (2d Cir. 2001) ("Under the collective or imputed knowledge doctrine, an arrest or search is permissible where the actual arresting or

searching officer lacks the specific information to form the basis for probable cause or reasonable suspicion but sufficient information to justify the arrest or search was known by other law enforcement officials initiating or involved with the investigation.").  Therefore, "[t]he determination of probable cause does not turn on whether the fellow agent's observations were accurate, but on whether the arresting agent was reasonable in relying on those observations." *Panetta*, 460 F.3d at 395 (internal quotation marks and alterations omitted).

If a court concludes that a search or seizure violated the Fourth Amendment, it must determine whether to suppress the evidence obtained as a result of that illegal search or seizure. *See Mapp v. Ohio*, 267 U.S. 643 (1961).  The exclusionary rule "encompasses both the 'primary evidence obtained as a direct result of an illegal search or seizure' and . . . 'evidence later discovered and found to be derivative of an illegality,' the so-called 'fruit of the poisonous tree.'" *Utah v. Strieff*, 579 U.S. 232, 237 (2016) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

## III.    DISCUSSION

### A.  Terry Stop vs Arrest

A consensual encounter ripens into a seizure, whether an investigative detention or an arrest, when a reasonable person under all the circumstances would believe he was not free to walk away or otherwise ignore the police's presence.  *See United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992).  "The test is an objective one . . . based on how a reasonable innocent person would view the encounter."  *Id.* (citations omitted).

Barnes argues that the NYPD officers arrested him prior to the search of his backpack, given the fact that one officer held onto his arm while other officers stood around him, and therefore the officers needed probable cause to search his person.  Doc. 28.  He argues that they

did not, in fact, have probable cause to do so.  *Id.*  The Government argues that the investigatory stop became an arrest only after the officers felt the firearm in the backpack, providing them with probable cause at that point.  Doc. 32.

A *Terry* stop becomes an arrest, and the Government must therefore show probable cause, if "the totality of circumstances indicates that an encounter has become too intrusive to be classified as an investigative detention." *Posr v. Doherty*, 944 F.2d 91, 98 (2d Cir. 1991) (quoting *United States v. Hastamorir*, 881 F.2d 1551, 1556 (11th Cir. 1989).  The factors relevant to this question of ripening into an arrest include "(1) the length of time involved in the stop; (2) its public or private setting; (3) the number of participating law enforcement officers; (4) the risk of danger presented by the person stopped; and (5) the display or use of physical force against the person stopped, including firearms, handcuffs, and leg irons." *United States v. Newton*, 369 F.3d 659, 674 (2d Cir. 2004).

Here, the initial actions of the officers did not constitute an arrest of Barnes.  The stop presented a risk of danger, given the fact that Barnes was reasonably suspected of being involved in a shooting in the minutes prior to the stop.  Also, while it is true that one officer held onto Barnes' arm during the frisk, the officers did not draw their weapons, and did not handcuff Barnes until after finding the firearm in his backpack.  Def. Ex. I at 1:28.  "[T]he Fourth Amendment permits the officer to take 'necessary measures . . . to neutralize the threat' without converting a reasonable stop into a *de facto* arrest." *Newton*, 369 F.3d at 674 (quoting *Terry v. Ohio*, 392 U.S. 1, 24 (1968)).  Additionally, the length of time involved in the stop was relatively short, with less than one minute passing between the initiation of the stop and the discovery of the firearm.  Def. Ex. E at 0:44–1:29.  Furthermore, the fact that there were several officers standing around Barnes during the stop does not in itself make the stop an arrest, as such action

8

does not rise to the level of unreasonable "means of detention that were more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993).

### B.  Reasonable Suspicion to Stop and Frisk

Barnes also argues that the officers lacked reasonable suspicion because they did not have a reasonable basis to believe that he had committed a crime.  Specifically, Barnes points out that, in comparison to the description of the shooter, he is older and taller, was walking alone, and was wearing a red hat, a du rag, a heavily patterned shirt, and a black mask.  Doc. 28 at 14. The Government argues that Barnes did match the description of the shooter, given that he was near the area where the shooter was last seen, was wearing a white t-shirt (albeit one with a pattern), red shorts, and carried a black bag.  Doc. 32 at 6.  The Government also argues that the officer could search the bag for a firearm because he had felt something hard inside of it and had "reason to believe that he [was] dealing with an armed and dangerous individual, regardless of whether he [had] probable cause to arrest the individual for a crime." *Terry*, 392 U.S. at 27.

Here, the Court finds that the officers had reasonable suspicion to stop and frisk Barnes because he generally matched the description of the shooter and was in the immediate vicinity of the shooting minutes after it was reported.  "[I]nherent in *Terry v. Ohio* is the notion that the standard of suspicion necessary to allow a frisk for weapons is not a difficult one to satisfy." *United States v. Oates*, 560 F.2d 45, 63 (2d Cir. 1977).  Moreover, once they felt an item believed to be a firearm in the backpack, they were allowed to search for it.  The description of the shooter's clothes compared with Barnes' are clearly close enough for an officer to reasonably believe that Barnes could have been the shooter, with one officer even telling Barnes at the time of the stop that he "literally match[ed] the description" provided by Sergeant Brennan.  Def. Ex. H at 1:17.  Barnes had the matching red shorts and black bag, and although the t-shirt did contain

a graphic pattern, it was a white t-shirt.  Additionally, it is clear from the body camera footage that both Officer Callinan and Officer Eller felt a suspicious item, and immediately discovered the firearm upon opening the backpack and looking inside.

### C.  Post-Arrest Statements

Additionally, Barnes argues that his post-arrest statements, along with evidence of his possession of the firearm, should be suppressed as a "fruit of the poisonous tree."  Generally, "the fruit of the poisonous true doctrine requires the exclusion of the fruits of illegally obtained evidence."  *United States v. Ghailani*, 743 F. Supp. 2d 242, 250 (S.D.N.Y. 2010).  However, because the Court has concluded that the officers properly stopped and searched Barnes, this doctrine is inapplicable in this case.  Accordingly, the statements were lawfully obtained by the police.

### D.  Evidentiary Hearing

Ordinarily, the Court must hold an evidentiary hearing on a motion to suppress if the moving papers are "sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact going to the validity of the search are in question." *United States v. Durand*, 767 F. App'x 83, 87 (2d Cir. 2019), *as amended* (Apr. 16, 2019) (internal citations and quotation marks omitted).  This must be shown "by an affidavit of someone with personal knowledge of the underlying facts" which establish that "disputed issues of material fact exist."  *United States v. Viscioso*, 711 F. Supp. 740, 745 (S.D.N.Y. 1989) (internal citations and quotation marks omitted).  However, an evidentiary hearing will not be required "if the defendant's statements are general, conclusory or based on conjecture."  *Id.* Courts in this district "have broad discretion when deciding whether or not to hold a suppression

hearing." *United States v. Shamsideen*, No. 03 Cr. 1313 (SCR), 2004 WL 1179305, at *9
(S.D.N.Y. Mar. 31, 2004).

Barnes maintains that a hearing is required in order to resolve the factual disputes in this
case, while the Government claims that no material facts are in dispute.  Specifically, Barnes
argues that the officers heard a more detailed description of the shooter from the central dispatch
radio run, including height and age, than the description provided by Sergeant Brennan, and thus
did not have a reasonable basis to believe that Barnes was the shooter.  Doc. 33 at 2–3.  Barnes
also argues that the officers had no reason to search his backpack because they were likely not
capable of feeling the firearm from the outside of the backpack.  *Id.* at 3.  In response, the
Government argues that the officers did not hear the more detailed description that was present
on the 911 call, and that the descriptions from Sergeant Brennan and the radio run were the
same.  Doc. 35 at 2.  The Government also argues that Barnes is trying to create an issue of fact
where there is none regarding the ability to feel the firearm from the outside.  *Id.* at 1–2.

The Government correctly points out, as borne out by the Court's review of the video
footage of the officers' body cameras, that Barnes' backpack appeared to be fairly slack, and that
both officers Callinan and Eller concentrated on an object in the lower right-hand side of the
backpack.  Moreover, the instant reaction of Officer Eller upon looking inside the backpack is
inconsistent with Barnes' declaration that the gun was wrapped in clothing.  *See* Def. Ex. I at
1:28; Def. Ex. A at 2.  While the bag's leather material may have made it more difficult to feel
the firearm inside, it does not follow that the officers were unable to feel the firearm at all, as
Barnes claims.  Doc. 33 at 3.  Additionally, while it may be the case that the officers had heard

additional descriptors of the shooter from the radio run,[3] such factors do not detract from the fact that Barnes matched the shooter's general description and that he was found in the vicinity of the shooting.  Therefore, as Barnes has not shown with sufficient specificity that the material facts are in dispute, an evidentiary hearing on his motion to suppress is unnecessary.  *See United States v. Durand*, 767 F.App'x 83, 87 (2d Cir. 2019), *as amended* (Apr. 16, 2019) (internal citations and quotation marks omitted).

## IV.    CONCLUSION

For all these reasons, Barnes' motion to suppress is DENIED, and his motion for an evidentiary hearing is DENIED.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 27.

SO ORDERED.

Dated:    October 21, 2022
          New York, New York

_____
          Edgardo Ramos, U.S.D.J.

---

[3] Barnes and the Government both argue about the contents of the central dispatch radio run.  *See generally* Docs. 33, 35.  The transcript of the radio run does not contain a description of the shooter's age, height, or build, though there are several sections of the transcript noting that the words are unintelligible.  Doc. 44-2.